Michael L. FUNK, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 91–SC–065–MR.

Supreme Court of Kentucky.

Sept. 24, 1992.

Rehearing Denied Jan. 21, 1993.

Deanna L. Dennison, R. Matthew Moore, Covington, for appellant.

Chris Gorman, Atty. Gen., David A. Sexton, Joseph R. Johnson, Asst. Atty. Gen., Crim. Appellate Div., Frankfort, for appellee.

LEIBSON, Justice.

On May 1, 1989, the body of a seven year old girl, Jennifer Iles, was found in an abandoned, uninhabited house located at 1417 Chesapeake in Covington, Kentucky. The building was condemned by the city and in a badly deteriorated condition.

The child had disappeared on April 21, 1989, and had been the subject of widespread newspaper and television coverage. The owner of the premises where the body was discovered testified he visited the premises to check for the missing child three days before the discovery occurred, and he neither found the body nor detected the smell that would be expected had a body been there for any substantial length of time. The only access to the premises was through a window which was too high to reach except by climbing up on a cinder block.

When the body was found it was extensively decomposed and partially skeletonized. It was also infested with maggots and larvae, and the flesh of the child's thigh had been torn away in a manner which, according to the Commonwealth's forensic anthropologist, was consistent with dogs having attacked the victim and dragged her partially decomposed body to her final resting place. Traces of body substances left on the floor confirmed this.

On April 25, 1989, during the period of the child's disappearance, appellant, Michael Funk, had been arrested in nearby Norwood, Ohio, charged with the offense of gross sexual imposition for having digitally assaulted a nineteen month old child whom he was babysitting. Various persons who were appellant's cell mates in the Ohio Jail testified at his trial on the present charge as to statements Funk made incriminating himself in the assault and murder of Jennifer Iles.

Funk was indicted and tried in Kenton Circuit Court for capital murder and first-degree burglary. He was convicted of first-degree burglary and involuntary (second-degree) manslaughter. The jury could not unanimously agree upon what sentences to impose. The court then imposed the maximum sentence of 20 years for first-degree burglary and 10 years for second-degree manslaughter, to be run consecutively. This appeal followed, raising six issues:

1) Error in admitting into evidence photographs of the decomposed, maggot infested, canine damaged body of the victim.

2) Error associated with admitting evidence of the Norwood, Ohio offense: first, in permitting any evidence that this offense had occurred, and then in permitting extensive testimony regarding this prior offense from a police officer, a physician, and the mother of the little girl that had been victimized.

3) Failing to declare a mistrial because the prosecution had withheld exculpatory evidence which was material to the defense.

4) Failing to dismiss the Burglary I charge because the premises where the body was found did not meet the statutory definition of an inhabited building.

5) Error in the jury instructions regarding reasonable doubt.

6) Cumulative error.

For reasons that will be stated we reverse on grounds one, two, three and six, and remand subject for a retrial on the charge of Burglary I and Manslaughter II.

## I. THE PHOTOGRAPHS

Six different photographs were admitted over objection. They included close-ups of various rotting and decomposed portions of the victim's head, neck and thigh; massive maggot infestation; the area where the flesh had been torn away from the thigh by dogs; and the torso with the child's garment pushed up toward her waist and legs sprawled in a position suggestive of sexual assault. Other photographs and the uncontradicted testimony established that the child's body had been dragged across the floor and savaged by dogs, so the photographs depicted neither the cause of death, nor the condition or location of the body at the time of death.

The Commonwealth argues the photographs were properly admitted to show the condition of the room and because the Commonwealth's experts had referred to the photographs in testifying. The most offensive pictures were not offered as evidence while the Commonwealth's experts were testifying, but at a later time after a pathologist testifying for the defense challenged some of the conclusions from the

Commonwealth's pathologist. Nothing was apparent in the pictures which could have possibly assisted the jury in deciding this disputed testimony. The pictures were repulsive and extremely offensive by any standard, even considering the extent to which the public has been desensitized by modern day television.

The Commonwealth's experts testified to their findings and opinions from their first-hand examination of the body, not from what they discovered on the pictures. Even if we were to accept that the reason for introducing the pictures was to assist the jury in understanding the expert testimony, then the appropriate time to introduce the pictures would have been contemporaneous with their use after a proper foundation had been laid, by asking the witnesses if and when these pictures would be of assistance in understanding their testimony, at the time when the experts were pointing out what the pictures showed.

The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). In *Salisbury v. Commonwealth*, Ky., 417 S.W.2d 244, 246 (1967), we explain:

> "Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive.... Where the photographs revealed nothing more than the scene of the crime and the persons of the victims, they were not incompetent [citations omitted]."

The photographs here exceeded the bounds of this explanation. The problem here is not that what the pictures showed was relevant, but what they showed that was irrelevant, offensive and highly prejudicial. They showed mutilation, decomposition and decay not directly related to the crime.

For instance, it is true that the Commonwealth's pathologist testified about various aspects of the *condition* of the child's clothes as suggestive of sexual assault, and the pictures in part supported his testimony. But the Commonwealth concedes "from the photographs one could see trails or pools of body fluids indicating that the cadaver had been moved several times by dogs." Thus the condition of *disarray* of the garments, while visually suggestive of a sexual assault, are of necessity unrelated to that cause.

Similarly, while the expert witness testified that larvae infestation in the genital area was consistent with trauma caused by digital penetration, and while this was a contested issue because of testimony from appellant's expert, looking at the pictures does not assist in resolving the conflict. It only generates shock and revulsion in the viewer.

This is a case, such as *Holland v. Commonwealth*, Ky., 703 S.W.2d 876 (1986) and *Clark v. Commonwealth*, Ky., 833 S.W.2d 793 (1992), where much of what is shown on the photographs was not directly relevant to the issues because the body had been materially altered by animal mutilation, decomposition and other extraneous causes unrelated to the commission of the crime, conditions that "tend to arouse passion and appall the viewer." *Clark*, draft op. p. 3. As we stated in *Clark:*

> "Imprinting a lasting inflammatory image in the minds of the jurors far outweighs any relevant value the [photographs] may have."

And as we stated in *Holland:*

> "[T]he presentation of photographs depicting the animal mutilation of the corpse goes far beyond demonstrating proof of a contested relevant fact." 703 S.W.2d at 879.

■ This is not a case where proof of guilt other than the photographs was so overwhelming that we can rule out the possibility of any prejudice from their use. The principal proof of guilt consisted of the testimony of jailhouse informants as to incriminating statements the appellant allegedly made regarding this crime while in jail in Ohio on another offense and proof regarding that prior offense showing it was similar in nature. Unfortunately, because of the deteriorated condition of the body and the absence of physical evidence con-

necting the appellant to the crime, the cause of death and the circumstances surrounding the commission of this crime were difficult to establish. This is a case where the Commonwealth charged the defendant with intentional murder and sought the death penalty, and the jury convicted only of involuntary manslaughter, and even then it was unable to agree upon a sentence. It is, in a word, a close case, one lacking the overwhelming evidence of guilt essential to conclude that these photographs, which should not have been admitted, were not prejudicial error.

## II. THE PRIOR OFFENSE

The appellant contends he was tried and convicted in this case by this jury based upon his prior gross sexual imposition offense in Ohio, to which he pled guilty. Extensive evidence regarding this prior offense was introduced through testimony from the arresting officer, which was mostly hearsay, from the examining physician in the prior crime, and from the mother of the victim of the prior crime.

The threshold question is whether *any* evidence of the prior offense was admissible.

"The 'General Rule' is '[e]vidence of the commission of crimes other than the one that is the subject of a charge is not admissible to prove that an accused is a person of criminal disposition.' Lawson, *The Kentucky Evidence Law Handbook*, 2d ed., Sec. 2.20(A) (1984). Before admitting such evidence the burden is on the Commonwealth to establish a reason to apply some well-defined exception." *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380, 381 (1990).

The principle involved is thus stated in the newly enacted Kentucky Rules of Evidence, codifying our previous decisions on this subject:

"Rule 404(b) **Other crimes, wrongs, or acts.**

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party."

■ Here, subparagraph (2), covering prior acts "inextricably intertwined with other evidence essential to the case," does not apply. The Commonwealth has argued that evidence of the prior Ohio offense should be treated as evidence "intertwined," but the key to understanding this exception is the word "inextricably." The exception relates only to evidence that must come in because it "is so interwoven with evidence of the crime charged that its introduction is unavoidable." Lawson, *The Kentucky Evidence Law Handbook*, 2d Ed., Sec. 2.20, p. 37 (1984). See examples cited therein. Patently this is not a case where it would be necessary to suppress facts and circumstances relevant to the commission of the offense charged in order to exclude evidence of the prior offense.

■ The question then becomes whether evidence of the prior offense was of such a nature as to be relevant under one of the exceptions stated in KRE 404(b)(1), quoted above. Because common characteristics between the way the two crimes were committed and the short time interval between the two, one day apart, the prior crime was proof of "identity" of the appellant as the perpetrator of the second crime. "Common scheme," as such, is not included in the list of exceptions in KRE 404(b)(1), stated above, but evidence of another crime, committed close in time, with a common scheme, is probative to identify the perpetrator of the offense charged. Vince Walsh, one of the jail inmate witnesses who testified against the appellant, stated the appellant told him he would never be indicted for the Kentucky crime because he had just "fingered" the victim like he did the small girl in Ohio. The Commonwealth's pathologist testified he deduced from his

examination that the victim's vagina had been damaged consistent with having been penetrated in this manner. There was testimony about "Bugler" cigarette papers found at the scene of the Kentucky crime, and similar paper observed at the appellant's residence where the Ohio sexual assault occurred. Thus we conclude that evidence of the prior crime was admissible as bearing on an issue in controversy here, viz., the identity of the perpetrator.

■ The next issue is more difficult. Even where evidence of a prior crime has some relevancy, in admitting such evidence the trial judge must use some discretion in deciding whether and to what extent evidence of the prior offense may be utilized without prejudice:

> "[W]hen dealing with evidence of a litigant's prior misconduct, where such evidence is debatably or remotely relevant, the trial court must decide whether the *probative* value of the evidence outweighs its *inflammatory* nature. If it does, the evidence is admissible. Otherwise it is not." *Commonwealth v. Morrison*, Ky., 661 S.W.2d 471, 473 (1983). [Emphasis original.]

Here the evidence of prior misconduct was presented in such a way as to cause undue prejudice. Funk had admitted to the Norwood, Ohio police that he sexually assaulted a year and a half old little girl by inserting his finger into the child's vagina, and he pled guilty to a criminal offense designated "gross sexual imposition" for having done so. This admission and the plea of guilty were ample to prove what was necessary on the identity issue and as a basis for understanding evidence from cell mates about his jailhouse statements. Nevertheless, the Commonwealth called a Cincinnati physician to testify in detail as to the nature of the injuries sustained in the prior criminal act and the child's mother was questioned extensively about the prior occurrence. Much of this was irrelevant, such as the mother's testimony that she talked to Funk with her daughter the night of the incident and he denied anything had happened. The investigating police officer from Ohio went beyond the nature of the offense as admitted by Funk and into Funk's original denials and other irrelevant details, as well as investigative hearsay. A plain statement of the admissions the appellant made establishing the nature of the prior offense, introduced through the indictment and plea of guilty and the admissions the appellant made about the crime to the police officer, would have sufficed. The extensive use of overkill was unduly prejudicial and trial error.

## III. WITHHOLDING EXCULPATORY EVIDENCE

■ Appellant contends the trial court should have granted a mistrial because the Commonwealth withheld exculpatory evidence in violation of the rule in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as applied by our Court in *Carter v. Commonwealth*, Ky., 782 S.W.2d 597 (1990). This requires "the Commonwealth, upon request, to notify the defense in advance of trial of exculpatory evidence known to the prosecution." *Carter, supra* at 601. A pretrial order required the Commonwealth to furnish all "police documents" so the court could review them "for discoverable, exculpatory evidence and if any is found, provide same to counsel for the Defendant." When a Commonwealth's detective testified, he had in his possession a report which, among other things, contradicted the Commonwealth's pathologist's in-court testimony theorizing that the child had been sexually molested and asphyxiated. The detective's report stated that on the autopsy the pathologist reported that the cause of death was strangulation based on redness of the victim's throat, and that upon examination of the body sexual molestation could not be determined. At trial the Commonwealth's pathologist testified differently on both of these key points. The evidence in the detective's report surfaced after it was too late to cross-examine the doctor about these contradictions. The detective's report also revealed the presence of carpet hair particles found on the victim which would have placed her at a party which occurred at a point in time subsequent to

the time the Commonwealth's evidence placed the time of death.

Next, an FBI agent testified about a human hair fragment found on the victim's sock which came from a black person, and which tended to exculpate this appellant who is white. The appellant maintains this evidence also should have been revealed in advance of trial.

The exculpatory evidence withheld on discovery was of an importance and magnitude to constitute reversible error. It qualifies neither as inadvertently overlooked or not of a prejudicial nature. The Commonwealth argues that the complaint against this failure to disclose was not adequately preserved, but the record reveals the appellant protested the failure to disclose in both instances, and asked for a mistrial when the evidence about the foreign hair surfaced.

## IV. CRIMINAL LIABILITY FOR FIRST–DEGREE BURGLARY

■ The appellant was charged and convicted of first-degree burglary pursuant to KRS 511.020(1)(b), which provides in pertinent part:

"(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

. . . .

(b) Causes physical injury to any person who is not a participant in the crime."

The word "building" in KRS 511.020 is defined in KRS 511.010 as follows:

"(1) 'Building,' in addition to its ordinary meaning, means any structure, vehicle, watercraft or aircraft:

(a) Where any person lives; or

(b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation. Each unit of a building consisting of two (2) or more units separately secured or occupied is a separate building."

KRS 511.010 also separately defines "dwelling" ("a building which is usually occupied by a person lodging therein") and "premises" (which "includes the term 'building' as defined herein and any real property").

Appellant contends that the structure where the body was found, the abandoned, condemned and uninhabited building at 1417 Chesapeake in Covington, Ky., was not a "building" within the definition of a "building" as it applies to first-degree burglary because, conclusively, this was not a "building" where "any person lives" or where "people assemble for purposes of business, government, education, religion, entertainment or public transportation." The resolution of this issue turns on whether the qualifying phrases in subparagraphs (a) and (b) of KRS 511.010(1) refer to any "building" as the appellant contends, or refer only to the words "any structure, vehicle, watercraft or aircraft" as the Commonwealth contends.

The Commonwealth argues the first-degree burglary statute applies to every structure that meets the definition of a building as used in common parlance, without regard to whether it is inhabited or inhabitable. In 1980, the Kentucky General Assembly amended the language of KRS 511.020 to provide that the crime of first-degree burglary may encompass acts committed within a "building" in contrast to the language of the former statute requiring that the crime be committed in a "dwelling." The appellant contends the effect of the 1980 change is restrictive, and the Commonwealth contends the effect is expansive. The Commonwealth argues:

"In this case, the General Assembly clearly and unequivocally broadened the scope of KRS 511.020 to encompass 'buildings' and not just 'dwellings'. The intention of the General Assembly is so apparent on the face of the statute that there is no room for construction."

The Majority of this Court agrees.[1]

## V. INSTRUCTION ON REASONABLE DOUBT

■ The appellant contends the instruction on reasonable doubt at the conclusion of the guilt/innocent phase of this trial contains the same error we criticized in *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 141 (1988). In *Grooms* we stated:

> "This instruction was erroneous in that it tells the jury that if it has a reasonable doubt as to appellant's guilt it may nevertheless find him guilty. The instruction should have told the jury that if it had no reasonable doubt that he was guilty of some offense, but had a reasonable doubt as to the degree of the offense of which he is guilty, it should find him guilty of the lower degree." *Id.*

In this case no objection was made to the instruction at the time it was given, nor is there any evidence to suggest that the jury was misled in this respect. The most that can be said against the language of the instruction as given in this case is that it raises the possibility of a misunderstanding. We would not reverse this case, or any case, for a *Grooms* error unless preserved for appellate review as required by RCr 9.22. However, in the event of a retrial, instructions including lesser degrees of the burglary offense should be qualified by a reasonable doubt instruction worded as directed in *Grooms*.

## VI. CUMULATIVE ERROR

■ We have held that each of the errors discussed in Parts I, II and III of this Opinion are so prejudicial that a reversal and remand is required. We further agree with the appellant, that if each of these errors were not, in and of itself, sufficient to require a reversal, the cumulative effect of the prejudice from all three would certainly so require.

For the reasons stated above, the within case is reversed and remanded for further proceedings in conformity with this Opinion.

STEPHENS, C.J., and COMBS, LAMBERT and LEIBSON, JJ., concur.

LEIBSON, J., dissents in part, concurs in part by separate opinion, in which STEPHENS, C.J., and COMBS, J., join.

SPAIN, J., dissents by separate opinion in which REYNOLDS and WINTERSHEIMER, JJ., join.

LEIBSON, Justice, dissenting in part, concurring in part.

I concur in the Majority Opinion, Parts I, II, III, V and VI, and in the holding of our Court reversing and remanding.

I respectfully dissent from Part IV construing the word "building" in the first-degree burglary statute, KRS 511.020, as including an uninhabited structure so long as it conforms generally with the common meaning of a "building."

The history behind the present statute, the pattern of the law of which it is a part, a common sense application of the English language, and the rule of lenity that applies in construing criminal statutes where they are ambiguous, *all* support the appellant's position in this matter. The only reasonable conclusion is that the word "building" as defined in KRS 511.010(1) requires that the building is either a place "(a) [w]here any person lives; or (b) [w]here people assemble for purposes of business, government, education, religion, entertainment or public transportation." The statutes intend the same restrictions on the definition of a "building" for purposes of first-degree burglary as apply to any other "structure" as referred to in the statute. For reasons to be stated, any other construction is a logical absurdity.

### I. HISTORY

Historically, burglary was born into the common law as a separate substantive offense out of a desire to protect persons in the sanctity of the home. The present decision cuts it off from its historical roots.

---

1. The author of this Opinion disagrees, and has filed a separate Dissenting Opinion.

To understand the historical development of the burglary offense it is helpful to read the *Model Penal Code and Commentaries,* American Law Institute, Part II, Article 221, pp. 59–84. Burglary is not a crime which is an *end* in itself. It is a crime of *means,* a crime committed as a step to accomplishing some other offense. This particular step along the way to the commission of another offense evolved as a separate substantive offense because it was deemed a separate and singular nature from other attempts. It was separated because of the potential danger to occupants from breaking and entering into their home, even though such injury is not the crime intended:

"The initial development of the offense of burglary, as well as much of the later expansion of the offense, probably resulted from an effort to compensate for defects of the traditional law of attempt. The common law of attempt ordinarily did not reach a person who embarked on a course of criminal behavior unless he came very close to his goal.... Moreover, even when the actor's conduct reached the stage where an attempt was committed, penalties for attempt were disproportionately low as compared to the penalties for the completed offense.

The development and expansion of the offense of burglary provided a partial solution to these problems. Making entry with criminal intent an independent substantive offense carrying serious sanctions moved back the moment when the law could intervene in a criminal design....

.... Thus, entry into a home at night in order to commit a theft is surely a more aggravated offense than an attempted theft standing alone, because of the *additional element of personal danger* that attends such conduct. On the other hand, a greatly expanded burglary statute authorizes the prosecutor and the courts to treat as burglary behavior that is distinguishable from theft or attempted theft only on purely artificial

grounds." *Commentaries, supra, Id.* at 62–3.

The central, operative principles as explained in the Commentaries to the Model Penal Code are that all types of unlawful breaking and entering are now included under the general heading of "burglary" but it is only those limited situations where the unlawful entry poses a danger of harm to inhabitants, or could be reasonably expected to pose such a danger, that qualify as the higher degrees of burglary, Burglary I and II.

This principle carried over from the common law into the statutory development of the burglary offense, although there were statutes which confused matters by utilizing the term in describing lesser offenses that involved unlawful breaking and entering. When the Model Penal Code was adopted in 1974, Kentucky retained the requirement of "a dwelling" in the first-degree burglary offense. As stated in KRS 511.010(2), a " '[d]welling' means a building which is usually occupied by a person lodging therein."

Subsequent amendments of the Kentucky Penal Code in 1980 were not designed to destroy fundamental concepts, but simply to clarify the difference between burglary in the first degree and burglary in the second degree.

The logical progression of the unlawful entry statutes is destroyed when we define a "building" for purposes of first-degree burglary in broader terms than the word "dwelling" used to describe second-degree burglary. It is easy to understand the reason for expanding the concept of a "building" in the first-degree statute to include "any structure, vehicle, watercraft or aircraft" where persons live or people assemble if the unlawful entry is accompanied by one of the aggravating factors specified in subparts (a), (b) and (c) of KRS 511.020(1).[1] But it is illogical to believe that the General Assembly intended to punish every unlawful entry into a building,

---

**1.** "(a) Is armed with explosives or a deadly weapon; or (b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime."

even into an uninhabited or abandoned building, or into a barn, garage or shed never intended for human habitation, as a serious felony, in some instances more serious than unlawful entry into a dwelling. It is the potential danger to occupants which is the gravamen of burglary as distinguished from other unlawful entries; this was the reason behind creating burglary as a separate substantive offense from other steps along the way, steps which are punished, if at all, only as criminal attempts and only when the crime which was the object of the criminal enterprise was not accomplished. Now, under the Majority Opinion, entering an uninhabited building is punished more severely than entering an inhabited one if the offender is armed, or if, as here, the building becomes the location where the offender injures or threatens injury to a person he brings with him. The historical elements of the offense are gone.

## II. STATUTORY CONSTRUCTION

KRS 511.010(1) states in pertinent part:

" 'Building', in addition to its ordinary meaning, means any structure, vehicle, watercraft or aircraft:

(a) Where any person lives; or

(b) Where people assemble for purposes of business, government, education, religion, entertainment or public transportation."

The Majority has concluded that location of the phrase "in addition to its ordinary meaning" as placed after the word "building" in KRS 511.010(1), means the qualifying language in subparagraphs (a) and (b) apply only to structures other than a building. The Majority presents no reason for treating a building differently and more severely than any other structure other than the "plain meaning" rule of statutory construction. Barns, equipment sheds, and a vast array of uninhabited and uninhabitable buildings far afield from the original burglary concept fit the ordinary English definition of the word "building" (Webster's Ninth New Collegiate Dictionary, 1983), and thus unlawful entry into such uninhabited buildings is now construed as

subject to punishment under the Burglary I statute if the person entered for an unlawful purpose "armed with explosives or a deadly weapon." KRS 511.020(1)(a).

Surely the General Assembly did not intend such an absurdity, and our duty is to construe statutes to avoid "a hypertechnical, literal interpretation that would lead to a wholly unreasonable conclusion." *Board of Educ. v. Logan Aluminum, Inc.*, Ky., 764 S.W.2d 75, 80 (1989). As stated in *City of Frankfort v. Triplett*, Ky., 365 S.W.2d 328, 330 (1963), "[m]yopic exactitude in the construction of statutes would produce many an unfortunate and unintended result." "When all else is said and done, common sense must not be a stranger in the house of the law." *Cantrell v. Kentucky Unemployment Insurance Commission*, Ky., 450 S.W.2d 235, 237 (1970).

## III. RULE OF LENITY

The ALI Model Penal Code defines the elements of burglary in the highest degree as requiring "a building or occupied structure," and specifies that it is a "defense to the prosecution for burglary that the building or structure was abandoned." *See Model Penal Code and Commentaries, supra*, Sec. 221.1, pp. 60–61. The Commentary explains:

"The important notion that ties these provisions together is that of occupancy.... Restricting the offense to *buildings and other occupied structures* confines it to those intrusions that are typically the most alarming and dangerous...." *Id.* at 71–72. [Emphasis added.]

The Model Penal Code provides the legislative history for our statute. Somewhere in the transposition, the drafters of our Penal Code changed the phraseology from "building and other occupied structures" to " 'Building,' in addition to its ordinary meaning, means any structure," etc. Perhaps this was to narrow the scope of Burglary I to inhabited premises rather than just premises "usually occupied by a person lodging therein," as required in the definition of a "dwelling." KRS 511.010(2). The Majority Opinion turns this around to

the opposite conclusion, making the act of breaking into an uninhabited building a more serious offense than breaking into a dwelling.

The rule of "lenity" is a rule of statutory construction that applies to the interpretation of penal statutes; if the statute is ambiguous, a criminal is entitled to the more lenient construction. *Boulder v. Commonwealth*, Ky., 610 S.W.2d 615 (1980). As stated in *Stoker v. Commonwealth*, Ky., 828 S.W.2d 619, 627 (1992), the "rule of lenity [still] applies in interpreting criminal statutes." The Majority decision in this case, which classifies unlawful entry into an abandoned, uninhabited and condemned building as Burglary I whereas it could not qualify as Burglary II, is an obvious violation of the rule of lenity.

It may well be that the appellant is guilty of having committed a terrible, outrageous crime against this unfortunate victim, Jennifer Iles. Indeed, if the jury was convinced that he was responsible for this child's death, it is difficult to understand why the appellant was convicted of involuntary manslaughter rather than wanton murder. But the seriousness of the homicide offense is no basis for piling on a conviction for first-degree burglary. The appellant's Motion to Dismiss this charge should have been sustained.

STEPHENS, C.J., and COMBS, J., join.

SPAIN, Justice, dissenting.

Respectfully, I dissent from that portion of the majority opinion which reverses the judgment of conviction entered by the Kenton Circuit Court against Michael L. Funk. Funk received a fundamentally fair trial, and reversal on the basis of the claimed errors serves no useful purpose.

The photographs admitted by the trial court were relevant to the testimony of Dr. David Wolfe to help show that buttons had been torn loose from the child's blouse, which was suggestive of a possible sexual assault. From the photographs, one could see trails or pools of body fluids indicating that the cadaver had been moved, which was consistent with the Commonwealth's theory that the child had been killed in the building and her body left there. Utilizing the photographs, Dr. L.C. McCloud testified about the scratches on the victim's chest and abdomen; the location of the body and the disarray of the victim's clothes; the condition of the clothes, which was indicative of a sexual assault; and the position of a necklace around the victim's neck, which connected Funk. This testimony was further consistent with Funk's admissions to the Ohio inmates that he had digitally penetrated the child's vagina. Under all these circumstances, no abuse of discretion occurred in the admission of the photographs. *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980). The majority should be reminded that Funk was only found guilty of second-degree manslaughter rather than the charge of intentional murder, which clearly indicates that these photographs were not "devastatingly prejudicial," as each of Funk's appellate counsel has argued.

The prior guilty plea conviction of Funk in Ohio for "gross sexual imposition," also involving digital penetration of a little girl, was properly admitted by the trial court for the purpose of identity. KRE 404(b); *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380, 381 (1990). It is not difficult to conclude that the prior offense, which occurred *on the day before* Jennifer Iles disappeared, was so "inextricably intertwined" with the other evidence that it would have been virtually impossible, without distorting the truth, to separate the two. *See Ware v. Commonwealth*, Ky., 537 S.W.2d 174 (1976). The trial judge appropriately admonished the jury that the testimony about the events of April 20, 1989, in Ohio was to be considered by them only as it went to demonstrate common scheme, identity, motive, or intent, and that this evidence was not to be used as direct evidence of the charge for which Funk was on trial in Kentucky. *Jones v. Commonwealth*, Ky., 554 S.W.2d 363, 367 (1977); *See Hardy v. Commonwealth*, Ky., 719 S.W.2d 727 (1986).

Concerning the alleged withholding by the Commonwealth of exculpatory evidence, I would decline to review the issue

since Funk's three trial attorneys failed to move for a mistrial or a continuance when the evidence was admitted. The claimed exculpatory value, if any, of these two police reports to Funk is rather questionable since no mistrial motion resulted from their admission. *Cf. Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Carter v. Commonwealth,* Ky., 782 S.W.2d 597 (1990). We should not require a trial court to act *sua sponte* to grant mistrials where defense counsel has failed to act.

Funk has also not proven that the Commonwealth withheld the two police reports in question. The trial court properly ordered the disclosure of the reports after making a finding that "[a]ll exculpatory and other discoverable evidence had been provided to the Defendant with the exception of two (2) Covington Police Reports authored by Sgt. Radenheimer and dated May 10, 1989 and May 18, 1989." The record reveals quite clearly that Funk had knowledge of the reports since his trial counsel cross-examined a police officer concerning the foreign hair found on the victim's body prior to the Commonwealth's seeking its admission at trial. Defense counsel ably questioned the detective concerning the report and any inconsistencies.

A third reason for passing review of this issue is because Funk has failed to make these disputed reports a part of the record on appeal, which makes their claimed value to Funk rather dubious.

Finally, the cumulative error argument must fail. Funk's jury conviction, and the penalty imposed by the trial court on him, are appropriate to his criminal acts for which he received a fair trial.

REYNOLDS and WINTERSHEIMER, JJ., join in this dissent.