RENDERED:  DECEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0797-MR

BILLY JOE HOUCHIN                                            APPELLANT

v.
APPEAL FROM GRAYSON CIRCUIT COURT
HONORABLE BRUCE T. BUTLER, JUDGE
ACTION NO. 18-CR-00026

COMMONWEALTH OF KENTUCKY                               APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, GOODWINE, AND JONES, JUDGES.

JONES, JUDGE:  Following a two-day jury trial in Grayson Circuit Court, the

Appellant, Billy Houchin, was found guilty of reckless homicide, a Class D

felony.[1]  On April 17, 2019, the trial court sentenced Houchin to serve five years

---

[1] Kentucky Revised Statutes ("KRS") 507.050.

under the supervision of the Kentucky Department of Corrections. Houchin now appeals to this Court as a matter of right.

On appeal, Houchin argues the trial court erred when it allowed the Commonwealth to introduce twenty-three photographs taken during the victim's autopsy. Houchin also argues the trial court erred in allowing the Commonwealth to try him in the first instance because he was entitled to immunity from criminal prosecution pursuant to KRS 503.085. He asks us to reverse his conviction and declare him immune from any further prosecution. Having reviewed the record and being otherwise sufficiently advised, we affirm.

## I. BACKGROUND

At the time of the events in question, the victim, Stephen Waninger ("Waninger"), was in a romantic relationship with Katelyn ("Katie") Houchin. Katie and her two children from a previous relationship lived with her mother, Lesle Houchin ("Lesle"), and her father, the Appellant, Billy Houchin ("Houchin"). The Houchins were also allowing Waninger, who worked for Houchin, to live in their home.

Sometime during the evening of December 28, 2017, the home's six residents retired for the evening. Katie and Waninger were sleeping together in bed. During the early morning hours of December 29, 2017, while still asleep, Katie took the sheets away from Waninger. Waninger awoke enraged and began

-2-

kicking and pushing Katie. Katie's cries for help awakened Houchin, who got out of bed and went to help her. When Houchin got to the couple's bedroom, he told Waninger to leave. When Waninger refused, the two men got physical with one another. At trial, Houchin testified that Waninger hit and choked him. The subsequent investigation revealed contusions and abrasions on both men as well as on Katie, leaving no doubt that a physical altercation had taken place in the home that evening.

After breaking free from the altercation, Houchin left the room to call 911. At this point, Waninger decided he did want to leave after all; he asked Lesle to drive him to Evansville, Indiana. Lesle, who had to go to work that day, refused to do so. Waninger then called his mother to come get him. At some point Waninger dropped the telephone and Katie picked it up, causing the dispute between the two to break out again.

In the other room, Houchin was on the phone with the 911 operator. For reasons that are not clear, Houchin's call became disconnected. Back in the bedroom, the tension between Waninger and Katie once again escalated to physical violence. Hearing the two fighting, Houchin went back to the bedroom to help his daughter. While Houchin was attempting to help Katie, the Grayson County 911 operator called Houchin back. Houchin answered the call and took his phone outside so he could talk with the 911 operator.

While Houchin was outside on the phone, the fight between Katie and Waninger spilled out of the bedroom into the kitchen. Lesle yelled for Houchin to come back inside to help Katie. Houchin handed the phone to Lesle and went to help Katie. Houchin pulled Waninger off of Katie. Houchin testified that at this point, he saw Waninger move toward three samurai swords that were laying on a bar stool in the kitchen. Houchin testified that he believed Waninger intended to use the swords to continue his attack on Houchin and his family. Believing he had mere seconds to prevent further violence against himself and his family, Houchin retrieved a firearm he kept on top of the kitchen cabinet and fired a shot directly at Waninger. The bullet struck Waninger in the upper right chest area. Lesle and Katie began performing CPR on Waninger at the direction of the 911 operator who was still on the phone with Lesle. Houchin placed his gun on the dryer and walked outside where police found him when they arrived a few minutes later. Waninger was pronounced dead on the scene.

Houchin was indicted on one count of manslaughter in the second degree, a Class C felony.[2] Following completion of discovery, Houchin moved the trial court to dismiss the charges against him on the basis that he was immune from criminal prosecution pursuant to KRS 503.085. After examining the record, the trial court denied Houchin's motion.

---

[2] KRS 507.040.

Ultimately, the case proceeded to a two-day jury trial, beginning on March 13, 2019. At trial, the Commonwealth presented testimony from eight witnesses and entered eleven exhibits into evidence. Of particular relevance to this appeal, the exhibits included twenty-three photographs of Waninger's body during his autopsy. Houchin's counsel objected to introduction of all the photographs. Without specifics, counsel argued that many of the photographs were largely duplicative, and therefore cumulative. The Commonwealth responded that the photographs were all different and were not overly gruesome as they did not depict the body cavity or anything of that nature. The trial court overruled Houchin's objection. The photographs were introduced during Dr. Donna Stewart's testimony. During Dr. Stewart's testimony, the Commonwealth published the photographs to the jury through an overheard projection. Dr. Stewart answered questions regarding what each photograph depicted in relation to the autopsy she conducted.

Houchin called four witnesses and testified on his own behalf. Following closing arguments, the case went to the jury. The jury was instructed on manslaughter in the second degree as well as the lesser-included offense of reckless homicide. After deliberating approximately four hours, the jury returned a guilty verdict on the lesser-included count of reckless homicide. As part of the sentencing phase, the jury recommended the maximum sentence of five years. On

April 17, 2019, the trial court entered a judgment of guilty and sentenced Houchin in accordance with the jury's recommendation. This appeal followed.

## II. ANALYSIS

### A. Admission of Autopsy Photographs

In reviewing a trial court's decision concerning admission of evidence, we apply an abuse of discretion standard: "[t]he test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citation omitted).

As noted earlier, over Houchin's objection, the trial court allowed the Commonwealth to introduce twenty-three photographs taken during Waninger's autopsy. The photographs were not introduced individually; rather, they were introduced collectively as the Commonwealth's Exhibit 11. Dr. Stewart authenticated the photographs as true and accurate depictions of the autopsy. Before answering questions about each individual photograph, Dr. Stewart provided a brief summary of her autopsy findings. She testified that Waninger died following a single gunshot wound to his chest. She explained that the shot entered Waninger's body at a height of approximately fifty-two inches above his heels and exited his body at a height of approximately fifty-one and one-half inches. The bullet traveled through the two shirts Waninger was wearing and

entered Waninger's body through his inner right chest. From there, the bullet perforated the middle lobe of Waninger's right lung and traveled on through his heart. It continued on through the lower lobe of Waninger's left lung and exited his body through his left chest. Dr. Stewart believed the bullet grazed Waninger's left arm as it exited his body leaving a small abrasion. Dr. Stewart testified that Waninger died of blood loss and malfunction of his heart due to the bullet severing his heart's conduction system. After summarizing her findings for the jury, the Commonwealth asked Dr. Stewart to explain the significance of each photograph for the jury. The photographs showed Waninger's body immediately before and during the autopsy as well as the articles of clothing he was wearing when shot. Dr. Stewart showed the jury how the photographs corresponded to the findings in her report.

Prior to Dr. Stewart's testimony, Houchin's counsel made a non-specific objection to the cumulative admission of the photographs. Counsel argued that many of the photographs were duplicative, and it was unnecessary for the Commonwealth to introduce all of them. The trial court did not evaluate each photograph individually. Rather, it flipped through the photographs, determined that they were probative as a whole, and overruled Houchin's objection.

On appeal, Houchin asserts that the trial court erred when it failed to assess each photograph individually. He claims this error prejudiced him with

respect to the introduction of four photographs, one depicting Waninger's body on top of the body bag before Dr. Stewart undressed and prepared the body for autopsy and three photographs of Waninger's bloody shirts.

"The general rule is that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992) (citation omitted). In making admissibility decisions regarding graphic videos or photos, the trial court must undertake an analysis under KRE[3] 403. *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015). KRE 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." The Kentucky Supreme Court has further explained, "[w]hen ruling on the admissibility of a gruesome photograph, the trial court should consider whether evidentiary alternatives would sufficiently prove the fact at issue without a comparable risk of prejudice. However, the evidence must be highly inflammatory and prejudicial to compel a party to employ evidentiary alternatives." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006) (citations omitted).

---

[3] Kentucky Rules of Evidence.

Houchin relies heavily on *Hall, supra*, to support his argument that the trial court erred when it denied his motion to exclude some of the photographs as duplicative. Hall shot his neighbors, Lisa and Allen Tacket, through an upstairs window in his home after a dispute broke out about the Tackets' dog coming onto Hall's porch. During Hall's trial, the Commonwealth introduced a ten-minute police video documenting the crime scene and a total of forty-three crime scene and autopsy photographs, twenty-eight of which were admitted over objection. Several of the photographs taken at the crime scene were extremely graphic. They showed the victims laying where they died. Blood and soft tissue splatter was evident in many of the photographs.

In analyzing whether the trial court erred, the Supreme Court first recognized that even though graphic photographs are not *per se* inadmissible, they are still subject to a KRE 403 balancing test. The Court held that

> in cases like Hall's, the trial judge cannot do a Rule 403 balancing for an individual photo in a vacuum. Instead, the judge must consider the photographs within the full evidentiary context of the case, giving due regard to other evidence admitted as well as evidentiary alternatives, so as to ascertain each item's "marginal" or "incremental" probative worth for purposes of weighing that value against the risk of prejudice posed by the evidence.

*Hall*, 468 S.W.3d at 824 (citation omitted). "Once the trial court has assessed probative value, it must then assess the undue prejudice that might flow from the evidence if admitted." *Id.* With respect to prejudice, the Court observed that "the

probative worth of each additional gruesome photograph [becomes] incrementally discounted as the facts to be proven become ever more certain, but admission of additional photos will also correspondingly increase the danger of undue prejudice." *Id.* at 826.

The *Hall* Court was particularly troubled by the fact that the photographs "were not addressed one by one or even in comparison to each other; rather, their admissibility was determined all at once as a group, with no emphasis on their relative or incremental probative value." *Id.* at 827. To this end, the Court held that

> [i]n the absence of specific findings in the record explaining the trial court's reasons for its decision, we cannot conclude that the admission of all 28 graphic crime scene and autopsy photos proffered by the Commonwealth was anything but "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." [*Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).] The simple fact is that the probative value of admitting all 28 photographs was substantially outweighed by the undue prejudice created by the photographs. Moreover, the admission of all 28 photographs, many of which depicted the same scene or subject merely from different vantage points, was needlessly cumulative. This Court, therefore, concludes that this case presents the rare instance of an abuse of the trial court's discretion under Rule 403 in admitting gruesome photographs.

*Id.*

After holding that the trial court abused its discretion by admitting all the photographs without a proper analysis of their evidentiary worth and prejudicial potential, the Court examined the error to determine whether it merited reversal of Hall's conviction. Ultimately, the Court was left with "little doubt that the horrific and inflammatory photographs improperly admitted in this case, and repeatedly emphasized by the Commonwealth during trial, substantially influenced the jury's decision to reject the defendant's affirmative defenses and, instead, convict him of intentional murder." *Id.* at 828. As such, it reversed Hall's conviction.

We agree with Houchin that the trial court did not deal with his objection in accordance with the Supreme Court's directives in *Hall*. The trial court did not examine each photograph for its probative value or even attempt to make any individualized assessment. This was error. However, we cannot agree that admission of the four photographs Houchin complains about on appeal warrants reversal.

The first photograph Houchin complains about shows Waninger's body as it was removed from the body bag in preparation for the autopsy. Waninger is clothed. Some bloodstain is visible around the waistband of his pants. While it is a photograph of a deceased victim, nothing else about the photograph is

gruesome or graphic, certainly not to the extent that it would inflame and prejudice the jury.

The next three photographs Houchin complains about show the shirts Waninger was wearing when he was shot. Waninger's outer shirt was black. A small tear is visible in part of the shirt, which Dr. Stewart testified was where the bullet perforated the cloth. Because the shirt is black, the blood stains are not immediately appreciable. The photograph of Waninger's white undershirt is a different story. The shirt is so blood soaked that it appears almost to be a red shirt. However, Waninger was not photographed in the shirt. The photograph at issue simply shows the bullet hole in the shirt after it was removed from Waninger's body. On the whole, we do not believe this photograph was so prejudicial that it would have swayed the jury's verdict.

The photographs in this case were taken as part of an autopsy. There is minimal blood and no soft tissue splatter. The gunshot that killed Waninger was relatively clean. It did not leave his body disfigured or in a gruesome state. "The autopsy photos show the gunshot wounds, lacking any disfigurement or gore." *Easterling v. Commonwealth*, 580 S.W.3d 496, 509 (Ky. 2019). "The photos are not of the same ilk as the gruesome photos described in *Hall*, but rather crime scene and autopsy photos similar to those routinely admitted into evidence. Even

if some photos were cumulative evidence, admission of the photos was harmless."

*Id.* (citations omitted).

### B. Immunity From Prosecution Under KRS 503.085

In relevant part, KRS 503.085 provides:

(1) A person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer, as defined in KRS 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer. As used in this subsection, the term "criminal prosecution" includes arresting, detaining in custody, and charging or prosecuting the defendant.

(2) A law enforcement agency may use standard procedures for investigating the use of force as described in subsection (1) of this section, but the agency may not arrest the person for using force unless it determines that there is probable cause that the force that was used was unlawful.

Houchin claims that he is immune from criminal prosecution because the force he used against Waninger is permitted under KRS 503.055(3), which provides:

A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force, if he or she reasonably believes it is

-13-

necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a felony involving the use of force.

Houchin filed a motion with the trial court seeking dismissal of the indictment against him on the basis that he was immune from criminal prosecution. After reviewing the evidence of record, the trial court denied Houchin's motion in a detailed nine-page order. After summarizing the evidence and laying out the applicable law, the trial court concluded:

> There is no evidence [Waninger] ever wielded the swords or stated that he was going to use them, only [Houchin's] statement that the victim was going for the swords. The Court finds the location of the swords to be troubling. The evidence shows there were at least two young children in the residence. The location of [Waninger's] body near an exit door of the residence could be found to show that [Waninger] was attempting to leave the residence. Also, [Waninger] asked both [Lesle] and his own mother to help him leave the residence. While the facts of this case do tend to show [Houchin] to be fearful for his safety and the safety of his daughter there are also facts in this case that would be best suited for a jury to decide. The *mens rea* of [Houchin] at the time of the incident is crucial to this case and a jury will be well equipped to determine this fact.

Record (R.) at 285-86.

"Where a claim of immunity is raised under the provisions of KRS 503.085, the prosecution may proceed only if the trial court believes that 'there is probable cause to conclude that the force was not legally justified' under the controlling provisions of KRS Chapter 503." *Taylor v. Commonwealth*, 567

-14-

S.W.3d 610, 612 (Ky. App. 2018) (quoting *Rodgers v. Commonwealth*, 285

S.W.3d 740, 754 (Ky. 2009)).  The standard of review for such a determination of

immunity is whether a substantial basis supports the trial court's findings of fact.

*Commonwealth v. Lemons*, 437 S.W.3d 708, 715 (Ky. 2014).  "The burden is on

the Commonwealth to establish probable cause and it may do so by directing the

court's attention to the evidence of record including witness statements,

investigative letters prepared by law enforcement officers, photographs and other

documents of record." *Rodgers*, 285 S.W.3d at 755.  Conversely, there is no

corresponding right for the defendant to oppose the Commonwealth's evidence of

probable cause with his own evidence of his justification.  *Id.*  When the

Commonwealth meets its burden of probable cause, prosecution must continue.  *Id.*

at 754-55.

"Probable cause has . . .  been defined as 'reasonable grounds for

belief, supported by *less than prima facie proof* but more than mere suspicion.'"

*Commonwealth v. Jones*, 217 S.W.3d 190, 200 (Ky. 2006) (Scott, J., dissenting)

(quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  The

standard of probable cause is relatively low and is based on the "practical

considerations of everyday life on which reasonable and prudent men, not legal

technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76

L.Ed.2d 527 (1983) (citation omitted).  A defendant's subjective belief in his

"assertion of self-protection is not absolute." *Gribbins v. Commonwealth*, 483 S.W.3d 370, 374 (Ky. 2016) (citation omitted). Rather, "[t]he court must consider the totality of the circumstances to determine whether probable cause exists to conclude that a defendant's use of force was unlawful." *Taylor*, 567 S.W.3d at 612.

In making a probable cause determination as to whether the force used by Houchin was legally justified, the trial court examined the record. Specifically, the trial court looked to the witness interviews conducted by Detective S.R. Sharp. Detective Sharp interviewed Katie, Lesle, and Houchin. The statements obtained by all three witnesses were largely consistent. Houchin shot and killed Waninger after Waninger had gotten into several violent altercations with both Houchin and Katie. R. at 196-202, 279-83. Houchin had visible injuries from the altercations as did Waninger. *Id.*

However, Katie stated to Detective Sharp that Waninger had asked Lesle to drive him back to Evansville, Indiana, before calling his mother to come get him from the Houchin residence. *Id.* at 197, 279-80. Additionally, Lesle confirmed to Detective Sharp that Waninger asked her to take him to Indiana and showed her his bloodied nose; however, Lesle refused because it was late, and she had work in the morning. *Id.* at 201, 281. Finally, while Waninger's body was found near the swords, it was also near the front door of the home. *Id.* at 216. It

was undisputed that Waninger was shot by Houchin before he had time to wield one of the swords. The only evidence that Waninger was attempting to get to the swords was Houchin's own statement that Waninger was going towards the swords. *Id.* at 200, 282-83. Importantly, neither Lesle nor Katie indicated that Waninger was moving towards the swords before Houchin shot him. In fact, the witness interviews indicated that Lesle yelled at Houchin "don't do it" when she saw Houchin getting his gun.

KRS 503.085(1) provides that "[a] person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action[.]" The question before the trial court was not whether there was probable cause to show that Houchin's defense of self-protection was reasonable but, rather, if there was probable cause to believe Houchin acted unlawfully and was therefore not entitled to immunity. "It is possible to establish probable cause of unlawfulness at the same time evidence justifying self-defense exists." *Commonwealth v. Bennett*, 553 S.W.3d 268, 273 (Ky. App. 2018). If probable cause is shown, it is an issue of fact to determine the weight of the evidence and decide to what extent a justification may apply. *Id.*

On the balance, we must agree with the trial court. While there is no doubt that the men were engaged in a physical altercation, questions remain regarding whether Houchin reasonably believed deadly force was necessary.

-17-

Based on the record, the Commonwealth had probable cause to prosecute. The position of Waninger's body as well as his statements to Lesle and his own mother could show that he was attempting to retreat. Additionally, as noted, neither Lesle nor Katie saw Waninger move toward the swords. If Waninger was attempting to leave the residence and not moving toward the swords to use them as a weapon, then deadly force would not have been necessary. In such a situation, the reasonableness of using more force than necessary is an issue best left for the jury to decide. *Smith v. Commonwealth*, 284 Ky. 80, 143 S.W.2d 859, 862-63 (1940). "The Supreme Court of Kentucky has recognized 'conflicting evidence as to whether [the] use of deadly force was justified' supports the preclusion of a pretrial finding of immunity." *Bennett*, 553 S.W.3d at 272 (quoting *Rodgers*, 285 S.W.3d at 754). Because the reasonableness of Houchin's use of deadly force was in dispute, the trial court did not err. There was a substantial basis for the trial court to find that there was probable cause to believe Houchin's use of force was unlawful under the circumstances.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the Grayson Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Julia K. Pearson
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Thomas A. Van De Rostyne
Assistant Attorney General
Frankfort, Kentucky