RENDERED: AUGUST 14, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0056-MR

ISAIAH BROWN                                            APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.               HONORABLE BRIAN C. EDWARDS, JUDGE
NO. 22-CR-000178-002

COMMONWEALTH OF KENTUCKY                     APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

A Jefferson County jury found Isaiah Brown ("Brown") guilty of murder (complicity) and robbery in the first degree (complicity). It fixed his punishment at twenty-two years' imprisonment for murder and ten years for first-degree robbery and recommended that those sentences run concurrently. The Jefferson Circuit Court sentenced Brown accordingly. Brown now appeals as a matter of right and challenges his convictions. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Jefferson Circuit Court.

## I. BACKGROUND

Fatima Alabusalim lived with her family in Louisville, Kentucky, when she began dating Rayshawn Tucker in the fall of 2018. Soon thereafter,

Alabusalim met Tucker's cousin, Isaiah Brown. Alabusalim would frequently smoke marijuana with Tucker and Brown.

At that time, Alabusalim also began dating DaMani Dulaney. Dulaney also lived and worked in Louisville. At trial, Alabusalim alleged that Tucker was bothered by her relationship with Dulaney and that as a result, Tucker formulated a plan to use Alabusalim to set Dulaney up for a robbery. According to their plan, Alabusalim would pretend to go out on a date with Dulaney. Brown and Alabusalim both helped to plan the robbery, though Alabusalim claimed that she only assisted because she was scared.

On January 3, 2019, Alabusalim exchanged a series of text messages with her friend Shamia. In these text messages, Alabusalim stated to Shamia that Tucker and Brown had her "setting people up" to rob.

On January 6, 2019, Dulaney borrowed his mother's Kia Optima and picked up Alabusalim for what he believed to be a date. The pair went for a walk on the pedestrian bridge connecting Louisville and Southern Indiana before going to dinner at a local restaurant. Alabusalim, in communication with Tucker, then directed Dulaney to take her to a park near her house, where the two sat in Dulaney's vehicle for approximately thirty to forty-five minutes before Tucker and Brown arrived.

At trial, the Commonwealth introduced certified business records into evidence from Verizon Wireless and AT&T for the mobile phones Tucker and Brown used in the relevant time period. Tucker's phone, beginning in "702," was on the Verizon Wireless network. Brown's phone, beginning in "356," was

2

on the AT&T network. The Commonwealth introduced the following text messages from the evening of the incident:

[6:10 p.m.] **Tucker**: Ets wat i was rey tell u
[6:10 p.m.] **Tucker**: She said bruh got money on em and shit
[6:11 p.m.] **Tucker**: Im wit dis bitch rn so i cant do nun
[6:11 p.m.] **Brown**: Wya
[6:12 p.m.] **Tucker**: Crib
[6:12 p.m.] **Tucker**: Im comin out newburg to drop her off in like a hour and a half prolly
[6:14 p.m.] **Brown**: I'ma jus chill itl take me that long to get out there
[6:14 p.m.] **Tucker**: Yea jus stay der I gotta come out der anyway
[7:10 p.m.] **Brown**: U ready bra
[7:10 p.m.] **Brown**: Dudes tryna shake
[7:13 p.m.] **Brown**: We gotta hurry
[8:29 p.m.] **Brown**: I'm bout to go to stop and go if u otw

The Commonwealth also produced records from cell phone towers that showed Tucker's phone traveling toward Newburg Road, where Brown lived, at approximately 8:30 p.m. The cell site data then showed Tucker and Brown's phones traveling toward the park where Dulaney and Alabusalim were located.

Tucker and Brown arrived at the park around 9:00 p.m. and exited their vehicle. Tucker approached the passenger side door of Dulaney's vehicle while Brown walked to the driver's side. Brown used a gun to break the driver's side window. Tucker pulled Alabusalim from the passenger seat of Dulaney's vehicle and Alabusalim took refuge in Tucker's vehicle. At trial, Alabusalim testified that she heard a single gunshot, and that as she, Brown, and Tucker left the scene together in Tucker's vehicle, Brown stated, "I shot him in the shoulder."

The next morning, a bystander called 911 to report that Dulaney's vehicle was still running, lodged in the park shrubbery, and that an individual (Dulaney) appeared to be deceased inside the vehicle. Emergency responders

3

declared Dulaney deceased at the scene. Dr. Amy Burrows, the assistant Medical Examiner, testified that Dulaney had died from a single gunshot wound to the back. Dr. Burrows testified that the gunshot wound had caused Dulaney to bleed to death. However, due to the nature of the injury, Dr. Burrows stated that it could have taken anywhere from several minutes to an hour for Dulaney to succumb to the wound.

The Louisville Metro Police Department's Crime Scene Unit ("CSU") collected evidence and photographed the scene. Importantly, CSU recovered a Cash America pawn ticket with Rayshawn Tucker's name on it and a single spent 9mm shell casing on the ground. Law enforcement officers also canvassed the surrounding neighborhood and spoke with Alabusalim's mother, who told them that Alabusalim and Tucker were together.

Immediately following the shooting, Tucker, Brown, and Alabusalim traveled to Tucker's grandparent's house in Frankfort, Kentucky. While on the way to Frankfort, Tucker directed Alabusalim to call her mother and inform her that she and Dulaney had been robbed by two unknown individuals.

The trio then returned to Louisville the next day, and Alabusalim spoke with Detective Timothy O'Daniel. Alabusalim testified that she gave a false statement to Detective O'Daniel. At this time, Alabusalim told Detective O'Daniel that Dulaney trafficked Xanax and that he had been killed by people he knew. Alabusalim also told him that she fled when the alleged perpetrators arrived and had Tucker pick her up. Detective O'Daniel testified that he did not

4

believe Alabusalim's story given that he had found a pawn receipt belonging to Tucker at the scene.

On January 9, 2019, Tucker, Brown, and Alabusalim drove to Pensacola, Florida, and stayed with Brown's father. While there, Alabusalim cooked, cleaned, and cared for Brown's younger siblings. Alabusalim testified that Tucker abused her, and that she was afraid to leave. On January 16, 2019, Tucker drove Alabusalim to Louisville, Kentucky, to have her withdraw funds from her Fifth Third bank account. The pair then returned to Pensacola and remained there for approximately three months.

In various text messages and phone calls, Alabusalim's family begged her to return to Louisville and tell the truth. In April 2019, Alabusalim left Brown's father's house and went to a friend's house. Alabusalim's mother drove to Florida, picked her up, and brought her back to Louisville.

After returning to Louisville, Alabusalim again spoke to Detective O'Daniel. During this conversation, Alabusalim denied that the incident was "set up," but told Detective O'Daniel that she had been directed to inform Tucker and Brown when she and Dulaney arrived at the park. Alabusalim further stated that Tucker had pulled her out of Dulaney's car, placed her in Tucker's vehicle, and that she then "blacked out" and missed the shooting. Alabusalim surrendered her cell phone to Detective O'Daniel for an extraction of its data.

Alabusalim later gave a third statement to law enforcement in which she admitted that she had lied about "blacking out" and missing the shooting.

5

During this statement, Alabusalim also conceded that Dulaney had not been involved in trafficking Xanax.

Brown was indicted, with co-defendants Rayshawn Tucker and Fatima Alabusalim, for the murder and first-degree robbery of DaMani Dulaney. Both Tucker and Alabusalim entered into plea agreements, and Brown was the sole defendant at trial.

The jury found Brown guilty of murder and first-degree robbery. In turn, the jury fixed Brown's punishment at twenty-two years for murder and ten years for the first-degree robbery. It recommended these sentences be served concurrently, and the trial court sentenced Brown consistently with that recommendation. This appeal followed.

Additional facts will be developed below as necessary.

## II. ANALYSIS

On appeal to this Court, Brown alleges the trial court made various errors which require reversal. First, he alleges that the trial court erred when it permitted alleged hearsay testimony attributing cell phone number "356" to Brown, as well as other numbers to various third-party non-witnesses. Second, Brown argues that the text messages from the "356" number should have been excluded because the Commonwealth failed to establish an adequate foundation for their introduction as Brown's statements. Third, Brown contends that the trial court erred in permitting Detective O'Daniel to comment on the truthfulness of Alabusalim's statements to police. Fourth, Brown alleges that the trial court erroneously admitted text messages from Tucker to Brown

6

under the co-conspirator exception to the hearsay prohibition. Finally, Brown claims that the trial court deprived him of a fair trial under the cumulative error doctrine. We address each of Brown's arguments in turn.

**A. While the trial court erred in permitting Detective O'Daniel to rely on the RTCC report in identifying the "356" number as belonging to Isaiah Brown and other cell phone numbers contained within the "356" call logs as belonging to other unnamed individuals, the error was harmless.**

*a. Identification of the "356" Phone Number as Belonging to Brown*

At trial, the Commonwealth sought to admit evidence from various separate phone numbers. It began by calling Deborah Lang, the Louisville Metro Police Department's tactical intelligence analyst, who provided testimony concerning Real Time Crime Center ("RTCC") "workups." RTCC is a branch of the Louisville Metro Police Department that analyzes public surveillance video, intelligence, and data from several sources to aid law enforcement. Lang testified that law enforcement officers frequently request a "workup" from RTCC when pursuing potential criminal suspects. She explained that a "workup" involves providing the officer with a person's name, date of birth, driver's license number, potential addresses, potential phone numbers, cars registered to that person, social security number, social media, and criminal records. Frequently, RTCC obtains the majority of this information through internet searches, but, when necessary, they also use various databases, including property valuation administration databases and a database called LexisNexis Accurint ("Accurint"). Accurint is an investigative technology that expedites the identification of people and their personal information through its access to a

7

comprehensive database of public records. RTCC utilizes Accurint to identify individuals associated with phone numbers.

The Commonwealth then called Detective O'Daniel to the stand. He testified that he frequently uses RTCC as a tool in his investigations. Detective O'Daniel testified that after finding a pawn ticket at the scene of the crime with Tucker's name on it, he contacted RTCC and requested Tucker's phone number. RTCC identified a "702" phone number as belonging to Tucker. After receiving this information, Detective O'Daniel then reached out to the carrier associated with that phone number, Verizon Wireless, to obtain Tucker's phone records. Verizon Wireless's records included a recent history of communications, cell site data indicating the approximate location of the phone, and the content of incoming and outgoing text messages. At trial, the Commonwealth introduced proper certification of the records, and the trial court admitted them pursuant to Kentucky Rule of Evidence ("KRE") 803(6), the business records exception to the hearsay rule.

Detective O'Daniel testified that in his review of the Verizon Wireless records associated with Tucker, he discovered that prior to the shooting, Tucker was communicating with a "356" number about robbing an individual. In turn, Detective O'Daniel again contacted RTCC to determine the owner of the "356" number. RTCC, using the Accurint database, identified the "356" number as belonging to Isaiah Brown. This phone number was on the AT&T network. The Commonwealth also admitted certified AT&T records for the "356" phone number. However, these records did not list Brown as the owner of the "356"

phone account; instead, the account was opened in the name of a barbeque business located next door to Brown's address on a residential street. Detective O'Daniel testified that the listing of the barbeque business as the owner of the "356" phone number was unsurprising, as, in his investigative experience, individuals often use false names on their phone records.

On appeal, Brown argues that the Accurint-provided information in the RTCC "workup" identifying the "356" number as belonging to him should have been excluded as impermissible hearsay. He properly preserved this issue by objecting to Detective O'Daniel's testimony that the telephone number belonged to Brown. As a result, we review this issue under the abuse of discretion standard. "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson v. Commonwealth*, 889 S.W.2d 781, 783 (Ky. 1994). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Pursuant to KRE 801(c), "'[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as provided by these rules or by rules of the Supreme Court of Kentucky." KRE 802. The rationale underlying the prohibition against hearsay is "a fear about the reliability of in-court testimony about out-of-court statements when the proponent is attempting to use the statements as substantive evidence in the

9

case." Edward J. Imwinkelried, *Evidentiary Foundations* § 10.02[1] (11th ed. 2020). The exceptions to the hearsay rule exist to accommodate "situations where it is impossible or impractical to present an actual witness, yet the proffered necessary evidence is inherently trustworthy under the circumstances." 5 John Henry Wigmore, *Evidence* § 1420, at 251 (rev. ed. 1974).

Here, the Commonwealth introduced text messages between the "702" number and the "356" number that it had received in certified business records from Verizon Wireless and AT&T. Brown does not contest the admissibility of these records. Instead, his issue lies squarely with Detective O'Daniel's reliance on the RTCC "workup," which was not admitted as an exhibit, in concluding that the "356" number belonged to Brown. Importantly, the "workup" identified Brown as the owner based upon information that it had obtained through the third-party data server, Accurint. A prior statement that a phone number belongs to a certain individual would generally constitute hearsay as it is an out of court statement offered to prove the truth of the matter asserted, KRE 801(c), and would therefore be excluded under KRE 802 unless one of the exceptions to the hearsay rule applies.

Typically, phone numbers are attributed to a specific individual using certified business records obtained directly from the carrier. Here, the Commonwealth followed this practice and admitted the phone carrier records associated with the "702" (Verizon Wireless) and "356" (AT&T) phone numbers in question. However, because the AT&T records did not reliably identify the

10

owner of the "356" number, Detective O'Daniel testified that he believed the "356" phone number to be associated with Brown based upon information forwarded to him by RTCC and supplied by the Accurint phone database. On appeal, the Commonwealth argues that the information from Accurint was admissible under KRE 803(17), the market reports exception. KRE 803(17) exempts from the hearsay prohibition: "Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." The application of this hearsay exception is a matter of first impression for this Court.

KRE 803(17) bears substantial similarity to its federal counterpart, Federal Rule of Evidence ("FRE") 803(17). KRE 803(17) only differs from FRE 803(17) in that KRE 803(17) includes "tabulations." [1] Due to the similarity in language and policy between the two exceptions, this Court looks to federal courts' interpretation and application of FRE 803(17) for guidance in construing KRE 803(17).

The market reports exception applies to documents that "recite established factual information" of the same sort as "market quotations," "lists," and "directories." *Cisson v. C.R. Bard, Inc.* (*In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*), 810 F.3d 913, 924 (4th Cir. 2016). In particular, the exception allows various compilations of objective facts, such as "price lists, stock market and futures market quotations (published in

---

[1] FRE 803(17) exempts from hearsay "[m]arket quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations."

11

newspapers of general circulation or specialty journals) . . . phone directories, mortality tables, registers of such things as animals and ships, and compilations of estimated value of commonly traded items like used cars, comic books, postage stamps, and similar items." 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, *Federal Evidence* § 8:101.

The exception does not account for "evaluative conclusions," *id.*, or statements that go beyond the recitation of "relatively straightforward objective facts." 2 BROUN ET AL., *McCormick on Evidence* § 321, at 587 (Robert P. Mosteller ed., 8th ed. 2020). Instead, the exception applies to "readily verifiable information such as telephone directories, price lists and the like," not to "statements that correctly can be classified as directions, opinions, suggestions, and recommendations." *Garvey v. O'Donoghue*, 530 A.2d 1141, 1145 (D.C. 1987).

As with other hearsay exceptions, the admissibility of market reports and similar commercial publications under KRE 803(17) is predicated on the two factors of necessity and reliability. 5 JACK B. WEINSTEIN & MARGARET A. BERGER, *Weinstein's Federal Evidence* § 803.19[1], at 803–131 (Joseph M. McLaughlin ed., 2d ed. 2014). Thus, in determining whether evidence is admissible under KRE 803(17), the inquiry does not end after concluding that the proposed evidence comports with the plain language of the Rule, *i.e.*, that it is purely a recitation of "relatively straightforward objective facts" and does not contain "evaluative conclusions." After surpassing this hurdle, the proponent of the

12

evidence must then lay the requisite foundation as to necessity and reliability of the evidence for admission under KRE 803(17).

Here, the admission of the Accurint data is considered necessary because it would be difficult or impracticable to locate and summon every person who contributed to its telephone number identification database. *See* WEINSTEIN, *supra,* § 803.19[1]. The question of Accurint's reliability, however, presents a more difficult question. The advisory committee's note to FRE 803(17) states that the "basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the complier to foster reliance by being accurate." "Reliability is based, at least in part, on evidence that the compilers 'stake their business or public reputations on the accuracy' of a compilation." *United States v. Arrington,* 634 F. Supp. 3d 57, 62 (W.D.N.Y. 2022) (internal citations omitted). Whether market reports and similar commercial publications meet "the requisite standard of trustworthiness entitling [them] to hearsay exemption must be determined on a case-by-case basis." *See* WEINSTEIN, *supra,* § 803.19[2][a].

Here, RTCC employee Deborah Lang testified that the intelligence branch routinely relies on Accurint data in formulating reports. Detective O'Daniel also testified that he frequently relies on the information forwarded to him in RTCC reports. However, the Commonwealth chose not to offer the underlying Accurint report for admission into evidence. While we acknowledge that KRE 803(17)'s broad language requires only that the evidence be "generally used and relied upon by the public or by persons in particular occupations," it is

13

implicit in the Rule that the underlying report be admitted for trial courts' reliability assessment. Because the Accurint report was not admitted in this case, it is impossible for this Court to determine its reliability with sufficient certainty. Without the admission of the underlying report, Lang and Detective O'Daniel's testimonies alone are incapable of establishing Accurint's reliability, and we simply cannot definitively determine whether Accurint may be characterized as a telephone directory such that its phone number identification entries would be admissible under KRE 803(17). As a result, we agree with Brown that the trial court erred in allowing Detective O'Daniel to attribute the "356" phone number to Brown based upon information from RTCC and Accurint.

However, per Kentucky Rule of Criminal Procedure ("RCr") 9.24, this Court "will deem an error in the admittance of evidence harmless 'if [it] can say with fair assurance that the judgment was not substantially swayed by the error.'" *Saxton v. Commonwealth*, 671 S.W.3d 1, 14 (Ky. 2022) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 595 (Ky. 2010)). "Our inquiry is not simply 'whether there was enough evidence to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Brown*, 313 S.W.3d at 595 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Here, we are assured that the judgment was not substantially swayed by the error merely because of the detective's testimony attributing the "356"

14

phone number to Brown. There was ample other circumstantial evidence tying the "356" phone number to Brown. The AT&T records obtained for the "356" number listed the owner as a barbeque restaurant, which happened to be located right next door to Brown's own residence. Further, the cell-site location records detailing the movements of the "702" and "356" numbers were telling. The data revealed that the "702" and the "356" numbers traveled to and from the scene of the murder together. This was supported by Alabusalim's testimony, in which she stated that Tucker and Brown arrived at the crime scene together. Additionally, certified records from Google indicated that Tucker had searched for directions to the street where Brown's residence was located on the night of the incident.

Following the murder, the cell site data then showed the two phone numbers together in Pensacola, Florida. This was consistent with Alabusalim's testimony that she, Tucker, and Brown fled there after the shooting. Detective O'Daniel provided further corroborating evidence when he testified that during his investigation, he was alerted that Brown had sold items at a pawn shop in Pensacola. At Detective O'Daniel's request, an Escambia County sheriff's deputy obtained the items Brown had sold and documentation proving that Brown had presented his driver's license and signed a document. This evidence further confirmed that Brown's location was consistent with the location of the "702" and "356" phone numbers provided by the cell site data. Finally, the Commonwealth introduced photographic evidence taken during the relevant period of Brown in front of a sign with the Pensacola State College logo.

15

These circumstantial facts, when taken together, clearly support an inference that Brown was the owner of the "356" phone number. Given the weight of the other evidence presented by the Commonwealth tying Brown to the "356" number, we cannot say that the admission of Detective O'Daniel's testimony as to the data supplied by RTCC and Accurint "substantially swayed" the judgment in this case. *Saxton*, 671 S.W.3d at 14 (quoting *Brown*, 313 at 595). The error was harmless.

### b. Identification of Other Phone Numbers

Brown additionally contends that the trial court erred in admitting Detective O'Daniel's testimony that other cell phone numbers contained within the "356" call logs belonged to Brown's brother and another individual alleged to be Brown's brother. Detective O'Daniel based this conclusion upon information forwarded to him by RTCC and supplied by the Accurint phone database. Because this was the same method employed above in attributing the "356" phone number to Brown, our holding above applies here with equal force. The only difference lies in the fact that Brown failed to preserve this issue, making it subject to palpable error review pursuant to RCr 10.26 rather than the abuse of discretion standard. *Potts v. Commonwealth,* 172 S.W.3d 345, 348 (Ky. 2005). Under this rule, an unpreserved error may be noticed on appeal only if the error is "palpable" and "affects the substantial rights of a party," and even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." RCr 10.26. In general, a palpable error "affects the substantial rights of a party" only if "it is more likely

16

than ordinary error to have affected the judgment." *Ernst v. Commonwealth,* 160 S.W.3d 744, 762 (Ky. 2005). An unpreserved error that is both palpable and prejudicial still does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, or unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006).

Brown fails to specifically allege what manifest injustice may have occurred as a result of the detective's testimony. Although there was limited other circumstantial evidence tying the phone numbers to Brown's brother and Brown's "suspected brother," the impact of this testimony was *de minimis*. It was merely a brief statement and served no other purpose than to provide context for Brown's non-incriminating text messages. Therefore, we cannot say that the admission of this testimony resulted in a manifest injustice, or that the admission of this testimony so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Id.*

**B. The trial court did not abuse its discretion in admitting the text messages for the "356" phone number.**

Brown argues that the Commonwealth failed to establish a sufficient foundation for the introduction of the text messages from the "356" number as his own statements. He properly preserved this issue in objecting to Detective O'Daniel's testimony that the telephone number belonged to Brown. As a result, we review this issue under the abuse of discretion standard. "Rulings

17

upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson*, 889 S.W.2d at 783. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

KRE 901(b)(4) states that authentication can occur through the "appearance, contents, substance, internal patterns, or other distinctive characteristics [of the writing], taken in conjunction with circumstances." This rule is "flexible and far-reaching" in allowing circumstantial evidence to authenticate a writing. *Sanders v. Commonwealth*, 301 S.W.3d 497, 501 (Ky. 2010) (quoting LAWSON, *The Kentucky Evidence Law Handbook* § 7.05(5) (4th ed. 2003)). The burden on the proponent of the evidence sought to be authenticated is "slight" and "requires only a prima facie showing." *Ordway v. Commonwealth*, 352 S.W.3d 584, 593 (Ky. 2011) (citing *Sanders*, 301 S.W.3d at 501).

Here, the Commonwealth provided adequate circumstantial evidence and clearly met its "slight" burden in establishing that the statements from the "356" number were Brown's statements. *Id.* The barbeque restaurant listed as the owner of the "356" phone number in the AT&T records was located right next door to Brown's residence. The Verizon and AT&T cell site location records showed that the "702" and the "356" numbers traveled to and from the scene of the murder together. Alabusalim testified that Tucker and Brown arrived at the crime scene together. Certified records from Google indicated that Tucker had

18

searched for directions to the street where Brown's residence was located on the night of the incident.

Further, the cell site data showed the two phone numbers together in Pensacola, Florida, and there was evidence that demonstrated that Brown had sold items at a Pensacola pawn shop. The Commonwealth also introduced a photograph of Brown in front of a sign with the Pensacola State College logo. This evidence corroborated Brown's presence at the same location, at various different points, as the "356" phone number.

All these circumstantial facts together support an inference that Brown did, in fact, author the statements in the text messages. The Commonwealth met the low threshold required for authentication, and the trial court therefore did not abuse its discretion in admitting these text messages into evidence.

**C. Although the trial court erred in allowing Detective O'Daniel to express his opinion as to the credibility of Alabusalim's prior statements, the error did not result in manifest injustice.**

Brown concedes that this issue is unpreserved. Because this claim of error is unpreserved, it is subject to palpable error review pursuant to RCr 10.26. *Potts,* 172 S.W.3d at 348. Under this rule, an unpreserved error may be noticed on appeal only if the error is "palpable" and "affects the substantial rights of a party," and even then, relief is appropriate only "upon a determination that manifest injustice has resulted from the error." RCr 10.26. In general, a palpable error "affects the substantial rights of a party" only if "it is more likely than ordinary error to have affected the judgment." *Ernst,* 160 S.W.3d at 762. An unpreserved error that is both palpable and prejudicial still

does not justify relief unless the reviewing court further determines that it has resulted in a manifest injustice, or unless the error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin,* 207 S.W.3d at 4.

Here, the alleged improper testimony occurred during the Commonwealth's examination of Detective O'Daniel:

> **Commonwealth**: I want to talk about the significance of this corroborating evidence [Commonwealth Exhibit Nos. 57 and 58 showing Fatima Alabusalim and Rayshawn Tucker at a bank].
> **Det. O'Daniel**: Yeah. So, uh, basically, I mean, we just—we try to corroborate evidence, um, and stories as people share them with us. And in this instance, it is Fatima [Alabusalim] and Rayshawn [Tucker] together but also in Louisville.
> **Commonwealth**: In Louisville, and what are they doing?
> **Det. O'Daniel**: They are at the bank.
> **Commonwealth**: And what are they doing at the bank?
> **Det. O'Daniel**: They're either, I don't recall, either depositing money or, uh, taking out cash.
> **Commonwealth**: Well, if Fatima [Alabusalim] testified that they were getting money out, any reason to dispute that?
> **Det. O'Daniel**: No.
> **Commonwealth**: Based on what you saw on the video. Okay? Do you agree?
> **Det. O'Daniel**: Yeah, I agree.

Following this exchange, the Commonwealth then elicited the following testimony from Detective O'Daniel concerning Alabusalim's conversations with the detective:

> **Commonwealth**: Let's talk about the corroborating information. First of all, as far as the scene—broken glass. Was what she [Alabusalim] told you corroborated by the scene?
> **Det. O'Daniel**: Yes.
> **Commonwealth**: And was the scene corroborating her version of what happened?
> **Det. O'Daniel**: Yes.
> **Commonwealth**: In terms of the one shot fired—one shot fired.
> **Det. O'Daniel**: Yes, sir.

20

**Commonwealth**: Was that corroborated by both the scene and the autopsy?

**Det. O'Daniel**: It was.

**Commonwealth**: So, they corroborated each other?

**Det. O'Daniel**: Yeah.

**Commonwealth**: Fatima [Alabusalim] was corroborated?

**Det. O'Daniel**: Yes.

**Commonwealth**: In terms of her telling you that he was shot outside the car—the shell casing, the scene, the lack of shell casing, the lack of evidence inside the car. Was that confirming and corroborating of Fatima [Alabusalim]?

**Det. O'Daniel**: Yes.

**Commonwealth**: Her account about being on a "date."

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Although she made it clear, or clearer that it was a bit of a ruse, right?

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Was that confirmed by Big Four Bridge?

**Det. O'Daniel**: Yes.

**Commonwealth**: Was that confirmed by her communications with DaMani [Dulaney] through Goodkid?

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Was it confirmed on BW3's packages?

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: The evidence and the information about the flight to Florida—in terms of—you have the pawn shop information already on Isaiah [Brown].

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Did you already know he was in Florida?

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Did you have cell site information by that time— by April confirming he was in Florida? Had been in Florida right after this?

**Det. O'Daniel**: Yes.

**Commonwealth**: Did Fatima [Alabusalim] corroborate all that?

**Det. O'Daniel**: She did.

**Commonwealth**: Again—did this cell site, cell phone records cross-confirm and corroborate what Fatima [Alabusalim] told you?

**Det. O'Daniel**: Yes.

**Commonwealth**: The situation with Rayshawn [Tucker] being a boyfriend to Fatima [Alabusalim]?

**Det. O'Daniel**: Yes.

**Commonwealth**: And DaMani [Dulaney] being just a guy she was just starting to go out with?

**Det. O'Daniel**: Yes, sir.

**Commonwealth**: Was that confirmed with the cell phone records and the records of contact between DaMani [Dulaney] and Fatima [Alabusalim], as well as Fatima [Alabusalim] and Rayshawn [Tucker]?

**Det. O'Daniel**: Through the Facebook records, yes.

**Commonwealth**: Facebook?

**Det. O'Daniel**: Yeah.

**Commonwealth**: Was the relationship—not romantic relationship—with Isaiah Brown but knowing Isaiah Brown—Fatima [Alabusalim]—was that confirmed by contents of her phone such as pictures of him in there down at Pensacola and his name showing up in her—in communications with Rayshawn?

**Det. O'Daniel**: Yes.

**Commonwealth**: Again, corroborating and confirming?

**Det. O'Daniel**: Yes.

Brown argues that Detective O'Daniel's testimony was an improper comment on Alabusalim's credibility. In its brief, the Commonwealth does not dispute that Detective O'Daniel's "conclusory testimony was improper," but instead notes that "Brown doesn't suggest it was false or misleading, or that it would have confused the jury about the evidence." Because the parties agree that the testimony was error, and the Commonwealth only disputes its impact on the fairness of the proceeding, we need not reach the merits of the issue, but instead may simply include it in our palpable error analysis under RCr 10.26.

On re-direct, the Commonwealth also elicited testimony from Detective O'Daniel regarding the credibility of Alabusalim's allegations of abuse against Tucker. The Commonwealth asked, "This idea of Rayshawn Tucker abusing her, beating on her . . . she has credibility with regards to that?" Detective O'Daniel responded, "I believe her, yes." It is well settled that a witness cannot vouch for the truthfulness of another witness either directly or indirectly. *Hoff v. Commonwealth*, 394 S.W.3d 368, 376 (Ky. 2011). The Commonwealth

22

concedes that this testimony was admitted in violation of the rule against vouching but insists that Brown suffered no prejudice as a result.

In turn, we consider whether the admission of the improper corroborative testimony, along with the erroneous question directly addressing Alabusalim's credibility, constituted a "palpable error" that "affect[ed] the substantial rights of [Brown]," and resulted in "manifest injustice." RCr 10.26.

When we engage in a palpable error review, the "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin,* 207 S.W.3d at 5. A palpable error is "easily perceptible, plain, obvious, and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). In other words, a palpable error occurs where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin*, 207 S.W.3d at 4.

Brown argues that Detective O'Daniel's testimony resulted in manifest injustice because the Commonwealth allegedly "lacked physical evidence at the scene linking Brown to the shooting, failed to call Rayshawn Tucker to testify about his plea and Brown's alleged involvement, and principally relied upon Fatima's [Alabusalim's] assertions to establish that Brown (not Tucker or Alabusalim) committed the crime." We disagree with Brown's characterization of the evidence as resulting in the deprivation of a fair trial. The Commonwealth introduced substantial evidence apart from Alabusalim's testimony that linked Brown to the crime. For example, it admitted cell phone location data from Tucker and Brown's phones showing them travelling to and

23

from the scene of the crime, text messages between Tucker and Brown explicitly discussing the robbery, and Alabusalim's messages stating that Tucker and Brown had her "setting people up" to rob. While it is unavoidable that Detective O'Daniel's testimony likely resulted in *some* prejudice to Brown, we cannot say that it resulted in a manifest injustice and so seriously affected the fairness, integrity, or public reputation of the proceeding as to be "shocking or jurisprudentially intolerable." *Martin,* 207 S.W.3d at 4.

### D. The trial court did not abuse its discretion in admitting Tucker and Brown's text messages.

Brown argues that the trial court erred in admitting the text messages from Tucker to Brown before and after they had allegedly murdered and robbed Dulaney. Specifically, Brown alleges that the Commonwealth did not establish that Tucker's statements in the text messages met the requirements for the statements of a co-conspirator exception to the hearsay prohibition, and that the text messages required Tucker's interpretation.

Brown preserved this issue through his continuing objection to the exhibits containing the text messages at trial. Thus, we review this issue under the abuse of discretion standard. "Rulings upon admissibility of evidence are within the discretion of the trial judge; such rulings should not be reversed on appeal in the absence of a clear abuse of discretion." *Simpson,* 889 S.W.2d at 783. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English,* 993 S.W.2d at 945.

Pursuant to KRE 801A(b)(5),

24

> A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:
>
> . . .
>
> > (5) A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

The co-conspirator exception requires that the proponent prove, by a preponderance of the evidence, the existence of three basic elements: "(1) a conspiracy existed, (2) both the defendant and the declarant were participants in the conspiracy, and (3) the statement was made during and in furtherance of the conspiracy." *Gerlaugh v. Commonwealth*, 156 S.W.3d 747, 752 (Ky. 2005). The law of evidence adopts the criminal law's definition of conspiracy as an agreement between two or more people to commit a crime. *See* Lawson, *supra*, § 8.30[1][b] (citing 5 JOSEPH M. MCLAUGHLIN, *Weinstein's Federal Evidence* § 801.34[3][a] (2d ed. 2013)). "A conspiracy begins . . . as soon as an agreement is reached to commit a crime." *Monroe v. Commonwealth*, 244 S.W.3d 69, 76 (Ky. 2008) (quoting LAWSON, *supra*, § 8.30[3] (4th ed. 2003)).

At trial, Alabusalim testified that she, Tucker, and Brown all participated in planning to rob Dulaney. Further, the Commonwealth introduced Alabusalim's personal messages to her friend wherein she stated that Tucker and Brown had her "setting people up" to rob. This is undoubtedly sufficient evidence for the trial court to believe by a preponderance of the evidence that a conspiracy existed. The remaining question, therefore, is whether the statements sought to be introduced were made in furtherance of a conspiracy.

The necessity that statements be made "in furtherance" of a conspiracy "guards against the use of untrustworthy hearsay," as it "attempts to bridge

25

the gap between the need to control conspiracies, which are inherently secretive and difficult to prove, and the need to protect idle conversations among criminal partners, as well as to minimize the admission of inadvertently misreported or deliberately fabricated evidence." *See* LAWSON, *supra*, § 8.30[3][a] (quoting 5 MCLAUGHLIN, *supra*, § 801.34[5]). In resolving whether statements were made "in furtherance" of a conspiracy, "[t]he determining factor is whether a statement in any way assists or advances the objectives of the conspiracy." *Monroe*, 244 S.W.3d at 77. Accordingly, casual conversation and idle commentary do not meet this requirement. *Id.* at 78.

Brown argues that the Commonwealth failed to establish that Tucker's statements in the text messages below were made "in furtherance" of a conspiracy. The following exchange occurred on the evening of the murder:

> [6:10 p.m.] **Tucker**: Ets wat i was rey tell u
> [6:10 p.m.] **Tucker**: She said bruh got money on em and shit
> [6:11 p.m.] **Tucker**: Im wit dis bitch rn so i cant do nun
> [6:11 p.m.] **Brown**: Wya
> [6:12 p.m.] **Tucker**: Crib
> [6:12 p.m.] **Tucker**: Im comin out newburg to drop her off in like a hour and a half prolly
> [6:14 p.m.] **Brown**: I'ma jus chill itl take me that long to get out there
> [6:14 p.m.] **Tucker**: Yea jus stay der I gotta come out der anyway
> [7:10 p.m.] **Brown**: U ready bra
> [7:10 p.m.] **Brown**: Dudes tryna shake
> [7:13 p.m.] **Brown**: We gotta hurry
> [8:29 p.m.] **Brown**: I'm bout to go to stop and go if u otw

Tucker's statements clearly assisted in aiding the objectives of the conspiracy. Tucker's text messages to Brown, while communicated in a casual tone, serve to inform Brown of developments in their plan (e.g., "[s]he said he got money on em and shit"), thereby "assist[ing] or advanc[ing] the objectives of the

26

conspiracy." *Id.* at 77. Furthermore, as to Brown's contention that the statements required interpretation by Tucker, we disagree. The meaning of the texts is apparent. As a result, the trial judge's decision to admit Tucker's statements in these text messages was not "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

Brown also pursues a similar argument concerning a January 8, 2019, text message from Tucker wherein he asserts that "Fatimah wanna see the article." This text message is, presumably, in relation to Alabusalim's concern regarding a news article, as the following exchange occurred between the Commonwealth and Detective O'Daniel immediately after the admission of the text message:

> **Commonwealth**: Detective O'Daniel, as the lead on this case, were you aware of media coverage?
> **Det. O'Daniel**: Yes.
> **Commonwealth**: Homicide? A dead young man? Was that covered in the media?
> **Det. O'Daniel**: Yes, sir.
> **Commonwealth**: Would there have been articles that existed on January 8, 2019?
> **Det. O'Daniel**: Yes.

Importantly, the text message occurred two days after the completion of the murder and robbery. "Any such statements . . . made . . . after the objectives of the conspiracy were accomplished were not made during the course and in furtherance of the conspiracy." *Marshall v. Commonwealth*, 60 S.W.3d 513, 520 (Ky. 2001). However, text messages between Alabusalim and her friend revealed that prior to killing Dulaney, Tucker and Brown had her "setting people up" to rob. The fact that Brown, Tucker, and Alabusalim were conspiring to rob others

27

cannot be disregarded merely because they only had the opportunity to do so once before they were apprehended.

Furthermore, the alleged error occurred while the trio was attempting to avoid discovery by the police. With the evidence presented in the record, we cannot assume that Brown, Tucker, and Alabusalim's conspiracy to continue "setting people up" to rob was completed. The statement relates to their intention to monitor media coverage of the murder and thereby further their plan by avoiding detection. Of course, the brevity of the statement and the lack of additional dissection by the Commonwealth reduces its probative value in advancing that point. Nevertheless, the bar for relevancy is low, and "[t]o show that evidence is relevant, only a slight increase in probability must be shown." *Yates v. Commonwealth*, 430 S.W.3d 883, 897 (Ky. 2014); KRE 401. Accordingly, we hold that the statement was admissible under KRE 801A(b)(5), as it went to show an intention to control damage to or detection of the conspiracy. As a result, we cannot say that the trial judge's decision to admit Tucker's statement that "Fatimah wanna see the article" was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *English*, 993 S.W.2d at 945.

### E. Reversal is not required under the cumulative error doctrine.

Brown contends that his convictions should be reversed on the basis of cumulative error. The cumulative error doctrine states that where there are "multiple errors, although harmless individually, [the errors] may be deemed

28

reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown*, 313 S.W.3d at 631.

Brown claims that if the asserted errors do not individually warrant reversal, then the cumulative effect of the errors requires reversal. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992).

The only errors in this case were Detective O'Daniel's improper testimony attributing phone numbers to Brown and other various third-party non-witnesses, and his opinion testimony regarding the veracity of Alabusalim's prior statements. Given the amount of other significant, compelling evidence presented tying Brown to the "356" phone number, and the *de minimis* nature of the attribution of phone numbers to other individuals related to Brown, the admission of Detective O'Daniel's testimony regarding the "356" phone number was harmless and his testimony regarding the other phone numbers did not constitute palpable error. Furthermore, the improper testimony as to Alabusalim's credibility did not constitute "manifest injustice." Individually, these errors were not substantial, nor were they "bordering, at least, on the prejudicial." *Id*. Although errors crept into this trial, Brown received a fundamentally fair trial, and the isolated instances of error were insufficient to create a cumulative effect which would warrant reversal of his convictions. *Furnish v. Commonwealth*, 95 S.W.3d 34, 53 (Ky. 2002), *as modified* (Dec. 10, 2002).

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

All sitting. Conley, Goodwine, Nickell and Thompson, JJ., concur. Bisig, J., concurs in result only by separate opinion which Lambert, C.J., joins.

BISIG, J., CONCURRING IN RESULT ONLY: I concur with the Majority's Opinion affirming the conviction of defendant Isaiah Brown. However, I write separately because I disagree that the trial court erred in allowing Detective O'Daniel to attribute the phone number found through the Accurint search to Brown. I would find that his testimony was not hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." KRS 801(c). "Declarant" is defined as "a person who makes a statement," and a statement is an "oral or written assertion." KRE 801. The "statement" in the Accurint report associating the phone number with Brown is the result of a computer database search and constitutes a data point or piece of information which is, importantly, subject to cross-examination. Even an executive from Accurint could not independently affirm or deny Brown's ownership of the phone number. Instead, if Brown elected to contest the number, he could certainly cross-examine Detective O'Daniel with any information in his defense. As such, a data point in this context is not the type of out-of-court declaration our hearsay rules are crafted to safeguard against.

Lambert, C.J., joins.

30

COUNSEL FOR APPELLANT:

Joshua M. Reho
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

James Havey
Assistant Attorney General